MICHAEL MCCOLLUM (SBN 235447)
McCollum Counsel, Inc.
1500 W. Alhambra Rd,
Alhambra, CA 91801-2009
Telephone: (213) 534-6070
Email: michael@mccollumcounsel.com

WILLIAM R. COWDEN (DCBN 426301) (*Pro hac vice application to be submitted)*
WILLIAM COWDEN LLC
Lead Trial Counsel
2502-D N. Harrison Street, #1127
Arlington, VA 22207
Telephone: (202) 642-0209
Email: wcowden@cowdenllc.com

*Attorneys for LACE MARKETING, LLC d/b/a LEISUREPAY*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LACE MARKETING, LLC d/b/a LEISUREPAY, a Florida limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>LIMITLESS X HOLDINGS, INC., a Delaware corporation; and JASPREET “JAS” MATHUR, an individual,<br><br>Defendants. | Case No.: ________________<br><br>**COMPLAINT FOR:**<br>(1) Violation of RICO, 18 U.S.C. § 1962(c);<br>(2) RICO Conspiracy, 18 U.S.C. § 1962(d);<br>(3) Fraud;<br>(4) Civil Conspiracy;<br>(5) Violation of Penal Code § 496;<br>(6) Money Had and Received;<br>(7) Intentional Interference with Prospective Economic Advantage;<br>(8) Intentional Interference with Contractual Relations;<br>(9) Quasi-Contract / Restitution Based on Unjust Enrichment;<br>(10) Conversion<br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Lace Marketing, LLC d/b/a LeisurePay ("Plaintiff" or "LeisurePay"), by and through its undersigned counsel, for its Complaint against Defendants Limitless X Holdings, Inc. ("Limitless X") and Jaspreet "Jas" Mathur ("Mathur") (together, "Defendants"), and with jurisdiction arising under both a Federal Question basis, and under Diversity, alleges as follows. This Complaint also describes the conduct of Wellness Brands LLC ("Wellness"), Paysuites Group LLC ("Paysuites"), and six of the straw merchant entities referred to collectively as the "Merchant Entities" (identified in Section III below). None of Wellness, Paysuites, or the Merchant Entities is named as a Defendant in this action; they are described because their conduct forms part of the enterprise, conspiracy, and agency allegations against Defendants.

### I. NATURE OF THE ACTION

1. Plaintiff Lace Marketing, LLC d/b/a LeisurePay ("LeisurePay") is an Independent Sales Organization ("ISO") that markets and services merchant credit-card processing on behalf of an acquiring bank. Merchant underwriting depends upon truthful disclosure of the merchant's identity, ownership, business model, processing history, and persons exercising operational control. Acquiring banks and ISOs rely upon those disclosures in deciding whether to assume the substantial financial risks associated with sponsoring merchants into the Visa and Mastercard payment systems.

2. This action arises from a scheme in which Defendants Limitless X Holdings, Inc. ("Limitless X") and its principal owner, Chairman and Chief Executive Officer, Jaspreet "Jas" Mathur ("Mathur"), obtained merchant-processing services by concealing from Plaintiff the identity of the persons directing and benefiting from those processing relationships. Defendants caused a network of nominally independent merchant entities (the "Merchant Entities") to apply for

merchant accounts that Plaintiff would not have approved had the true facts regarding ownership, control, and intended use of those accounts been disclosed. The Merchant Entities were organized and governed by Limitless X and Mathur with the intent to funnel fraudulent credit card charges and stolen credit card information into fraudulent payment-processing transactions from which Defendants profited. Although not named as Defendants in this lawsuit, each Merchant Entity acted as an instrumentality of, and at the direction of, Limitless X and Mathur.

3. Limitless X characterizes itself as a consumer packaged-goods company built around health, wellness, and beauty products, sold mainly through direct-response advertising and e-commerce. Its e-commerce platform depends on electronic payment processing to accept customer payments. Even before the events giving rise to this Complaint, however, Limitless X had encountered significant merchant-processing difficulties, including being placed on industry monitoring systems—a designation that materially impaired its ability to obtain electronic merchant-processing services on its own.

4. The Merchant Entities were not independent operating merchants acting for their own benefit. Rather, they functioned as underwriting-facing fronts, used to obtain access to Plaintiff's merchant-processing services while concealing the identity of the persons actually directing those relationships and receiving their economic benefit. Defendants structured the scheme to profit Limitless X and Mathur while shielding them from liability and facilitating fraudulent credit card transactions.

5. Wellness Brands LLC ("Wellness"), Paysuites Group LLC ("Paysuites"), and the Merchant Entities each performed distinct roles within that structure: Wellness recruited or coordinated merchant applicants, Paysuites referred those applicants to Plaintiff, and the Merchant Entities presented themselves as independent businesses seeking merchant-processing services. Defendants directed

and controlled the entire structure for their own benefit.

6. Plaintiff would not have approved the Merchant Entities' accounts, and Plaintiff's sponsoring bank would not have entered into the corresponding Merchant Agreements, had either known that (a) the Merchant Entities were acting on behalf of, or under the direction of, Limitless X or Mathur; (b) another undisclosed person exercised operational control over those processing relationships; or (c) the Merchant Entities were created to allow Limitless X to circumvent its terminated-merchant status. Truthful disclosure on any of these points would have materially affected Plaintiff's underwriting decision, which is precisely why Defendants concealed them.

7. After the Merchant Entities were approved, their transaction activity rapidly departed from the legitimate processing profiles represented during underwriting, generating extraordinary chargeback activity and substantial losses to Plaintiff under its contractual obligations to its sponsoring/acquiring bank—losses that were the foreseeable consequence of Defendants' concealment.

8. Funds generated through the Merchant Entity accounts were transferred out in a manner that prevented Plaintiff from recovering losses arising from chargebacks and related obligations.

9. Defendants' conduct was not limited to a single merchant account or isolated transaction. It involved multiple Merchant Entities, operating in a coordinated manner over time, and, when confronted with obstacles, Defendants obtained continued processing access through separately organized front-merchant applicants that likewise concealed the full extent of Limitless X's and Mathur's operational involvement.

10. Plaintiff's allegations are reinforced by public judicial findings entered in separate litigation involving another payment processor. Plaintiff does not contend those findings establish liability in this action; rather, Plaintiff relies upon them

insofar as they provide evidence relevant to knowledge, intent, enterprise structure, pattern, and continuity.

11. Specifically, the structure of the scheme employed against Plaintiff LeisurePay resembles a previously documented merchant-processing model involving entities associated with Limitless X in which merchant-processing access was obtained through entities other than Limitless X itself after processing restrictions against Limitless X had arisen. The similarities are relevant to demonstrate that the conduct alleged here was neither accidental, nor isolated.

12. Plaintiff seeks to recover the losses it sustained as a direct and foreseeable consequence of Defendants' fraudulent procurement of merchant-processing services, together with all statutory and common-law remedies available under federal and California law.

## II. THE MERCHANT UNDERWRITING PROCESS

13. The Visa and Mastercard payment systems depend upon acquiring banks and Independent Sales Organizations ("ISOs") to identify, investigate, and sponsor merchants seeking access to those payment networks. Before a merchant may process payment-card transactions, an acquiring bank must determine whether sponsoring that merchant presents an acceptable level of financial, operational, and fraud risk.

14. An "acquiring bank" (or "acquirer") is the financial institution that holds a merchant's merchant account and is directly authorized by Visa, Mastercard, and the other card networks to receive and settle card transactions on that merchant's behalf. It is distinct from the "issuing bank," which is the cardholder's own bank and the entity that actually issued the credit or debit card used in a given transaction. When a cardholder makes a purchase, the acquiring bank submits the authorization request through the applicable card network to the issuing bank, and, once the transaction is approved and settled, receives the transaction proceeds from the card

network and deposits them, net of fees, into the merchant's account.

15. Because the acquiring bank is directly liable to the card networks for chargebacks, fraud, card-brand fines, and other liabilities arising from the merchants it sponsors — liability that can arise even after the corresponding funds have already been disbursed to the merchant — acquiring banks impose the underwriting standards described in this Section, monitor merchants' chargeback ratios on an ongoing basis, and retain the authority to restrict, suspend, or terminate a merchant's ability to process transactions, including through card-network blacklisting mechanisms such as Mastercard's MATCH list and the Terminated Merchant File referenced elsewhere in this Complaint.

16. An ISO such as Plaintiff is not itself an acquiring bank and does not hold the direct contractual relationship with Visa or Mastercard that an acquiring bank holds. Rather, an ISO is a third-party agent, registered with and authorized by an acquiring bank, that markets the acquiring bank's Credit Card Processing Services, solicits and vets prospective merchants, and services approved merchant accounts on the acquiring bank's behalf — all subject to the acquiring bank's underwriting criteria and ongoing oversight, and all while remaining contractually responsible to the acquiring bank, as described below, for losses arising from the merchants the ISO refers.

17. Plaintiff LeisurePay operates as an ISO. Plaintiff markets merchant-processing services, collects underwriting information from prospective merchants, performs due diligence, submits merchant applications to its sponsoring acquiring bank, and services approved merchant accounts. Plaintiff is contractually responsible for ensuring that merchant applications accurately identify the merchant seeking processing services and disclose information material to underwriting decisions.

18. The underwriting process exists because acquiring banks assume

substantial financial exposure from the merchants they sponsor for participation in the Visa/Mastercard processing platforms. That exposure includes responsibility for chargebacks, fraudulent transactions, card-brand assessments, regulatory penalties, fines, reimbursement obligations, and losses that may arise after funds have already been paid to the merchants sponsored by the so-called acquiring bank participating in these electronic payment processing platforms.

19. Accordingly, acquiring banks and ISOs working with them rely upon truthful and complete disclosures regarding, among other things:

a. the merchant's legal identity;

b. beneficial ownership;

c. operational control;

d. persons directing the business;

e. prior processing history;

f. anticipated transaction volume;

g. products and services offered;

h. prior chargeback history;

i. prior account terminations;

j. placement on MATCH or other industry monitoring systems; and

k. any other information materially affecting underwriting risk.

20. Those disclosures are material because the identity of the merchant—and the persons actually controlling the merchant—often determines whether a merchant will be approved, declined, subjected to enhanced underwriting, required to post reserves, or denied access to the payment system altogether.

21. Had Plaintiff and its acquiring/sponsoring bank known the true identity of the persons directing, controlling, or economically benefiting from the Merchant Entity accounts described in this Complaint, neither Plaintiff nor its

acquiring/sponsoring bank would have approved these merchants' applications.

22. Merchant applications are submitted with the expectation that they accurately identify the merchant actually seeking payment-processing services. Underwriting decisions become unreliable when material information concerning ownership, control, or intended use of the account is omitted or concealed.

23. Defendants understood these underwriting requirements and understood that truthful disclosure concerning ownership, operational control, and their own processing history would materially affect Plaintiff's willingness to sponsor the Merchant Entities into the Visa and Mastercard payment systems.

24. Defendants therefore structured the Merchant Entity relationships to present Plaintiff with applications that appeared to involve independent merchants while concealing facts material to Plaintiff's underwriting decisions.

25. As a direct result of those misrepresentations and omissions, which occurred when the applications were electronically submitted and which continued into and throughout October of 2023, Plaintiff accepted the Merchant Entities into the payment-card system, facilitated their payment processing transactions during the third and fourth quarters of 2023, assumed contractual obligations to its sponsoring bank, and thereafter sustained substantial losses when the Merchant Entity accounts generated chargebacks, assessments, and other liabilities as further described herein.

## III. PARTIES, JURISDICTION AND VENUE

26. Plaintiff Lace Marketing LLC d/b/a LeisurePay ("LeisurePay") is a limited liability company that provided payment processing and ISO services and suffered direct chargeback, reserve, and related losses as a result of the fraud and racketeering activity described herein. LeisurePay has its primary business location at 7901 4th Street North, Suite 300, St. Petersburg, Florida 33702.

27. Defendant Limitless X Holdings, Inc. is a Delaware corporation with its

principal place of business at 9777 Wilshire Blvd., Suite 400, Beverly Hills, California 90212. Limitless X is a publicly traded company. Limitless X transacts business in, and committed tortious acts within, this District.

28. Defendant Jaspreet "Jas" Mathur is the Chairman and Chief Executive Officer of Limitless X and, upon information and belief, resides in or near Beverly Hills, California, within this District. At all relevant times, Mathur exercised operational control over Limitless X, including the conduct alleged herein. On information and belief, Mathur has also used, or directed others to use on his behalf, the alias "Blake Frost" in communications with Plaintiff, as alleged further below.

29. This Court has personal jurisdiction over Defendants because Limitless X and Mathur are domiciled in California, purposefully directed the scheme at, and derived substantial benefit from, this District, and committed and directed tortious acts within this District.

30. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c) because this action arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO").

31. This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a Florida limited liability company and no member of Plaintiff is a citizen of Delaware or California.

32. The Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the RICO claims that they form part of the same case or controversy.

33. Venue is proper in this District under 28 U.S.C. § 1391(b) because Limitless X resides in, and Mathur is domiciled in, this District, and because a

substantial part of the events and omissions giving rise to Plaintiff's claims — including the direction, control, and financial benefit of the scheme — occurred in, or were directed from, this District.

34. Venue is also proper under 18 U.S.C. § 1965(a) because Limitless X and Mathur reside and transact their affairs in this District.

35. Plaintiff is informed and believes, and on that basis alleges, that there exists, and at all relevant times existed, a unity of interest and ownership between Limitless X and Mathur such that no genuine separateness or individuality between them has existed at any time relevant to the conduct alleged in this Complaint, and that adherence to the fiction of their separate corporate and individual existence would sanction a fraud and promote injustice.

36. Plaintiff is further informed and believes, and on that basis alleges, that Mathur has dominated and controlled Limitless X such that Limitless X has, at all relevant times, functioned as a mere instrumentality, conduit, or alter ego through which Mathur conducted his personal affairs and the racketeering and fraudulent conduct alleged herein, in particular:

a. Mathur, as Chairman and Chief Executive Officer, exercised direct and personal operational control over Limitless X's merchant-processing relationships, including by personally directing, authorizing, or knowingly permitting Limitless X personnel (including Arjun Walia and Taha Shaikh) to manage the Merchant Entities' merchant IDs, Kount enrollments, and chargeback-mitigation systems as though those merchant accounts belonged to Limitless X itself — an admission reflected in Walia's own reference to the accounts as "our mids";

b. Mathur caused Limitless X to be, and Limitless X was, inadequately capitalized to satisfy the chargeback, fee, and penalty obligations that

were certain to arise from the processing activity Limitless X directed through the Merchant Entities, such that Limitless X and the network of nominee entities it controlled were structurally incapable of bearing the very liabilities their conduct was certain to generate;

c. Mathur caused the proceeds of the Merchant Entities' processing activity to be treated as, and commingled with, his own or Limitless X's general funds, routing those proceeds away from the nominee accounts in which they were nominally generated and into accounts controlled by or for the benefit of Limitless X and/or Mathur personally, without regard to corporate formalities or any accounting distinguishing corporate from personal funds;

d. Mathur caused Limitless X to be used, and Limitless X was used, as a shield against personal liability for a recurring scheme — evidenced by the materially identical structure the United States District Court for the District of Nevada found in FTC v. CardFlex, Inc., described in Section VI(F) below, in which Mathur personally instructed a separate payment processor on the handling of shell-company merchant accounts and directed funds from those accounts to Limitless X's own bank accounts, notwithstanding that Limitless X and Mathur are nominally distinct persons;

e. Mathur has held himself out publicly, including in his capacity as a social-media "influencer" promoting his personal brand and lifestyle, as personally synonymous with Limitless X's business and success, further reflecting the absence of any meaningful separateness between his personal identity and the corporate entity; and

f. on information and belief, Mathur failed to cause Limitless X to

maintain accurate corporate minutes, adequate records, or other indicia of a genuinely independent corporate existence separate from his personal direction and control.

37. Recognition of Limitless X's separate corporate existence from Mathur under these circumstances would sanction fraud and promote injustice, in that it would permit Mathur to obtain, direct, and personally benefit from the fraudulent scheme alleged herein while insulating himself from liability for the resulting injury to Plaintiff. Limitless X is, accordingly, the alter ego of Mathur, and Mathur is personally liable for the obligations of Limitless X alleged in this Complaint, and Limitless X is liable for the personal conduct of Mathur alleged herein. This allegation is pleaded in the alternative to, and without prejudice to, the allegations in Section VII below that Limitless X and Mathur are each a "person" distinct from the Enterprise within the meaning of 18 U.S.C. § 1961(3).

## IV. OTHER PARTICIPANTS IN THE SCHEME

The following entities are described below because their conduct is part of the factual basis for Plaintiff's claims against Limitless X and Mathur, including the RICO enterprise and civil conspiracy allegations. None of them is named as a Defendant in this action.

38. At all times relevant here, Wellness Brands LLC ("Wellness") was a limited liability company organized under Kentucky law with a primary business location in Kentucky. Wellness recruited individuals to form the Merchant Entities and contracted with each of them to divert the proceeds of their merchant accounts, as alleged in detail below, acting as an instrumentality of Limitless X and Mathur.

39. At all times relevant here, Paysuites Group LLC ("Paysuites") had a primary business location of 207 East Pennsylvania Boulevard, Feasterville, Pennsylvania 19053. Paysuites referred the Merchant Entities to Plaintiff and was,

upon information and belief, co-owned by Mike Wiener and Marty Wood.

40. At all times relevant here, Merchant Entity Alacrity Campaign LLC purported to have a primary business location of 3200 Greenfield Road, Suite 300, Dearborn, Michigan 48120. Marta Kopania, the reputed owner of the entity, completed a merchant processing application and agreement with Plaintiff's sponsoring bank that led to this merchant's participation in Plaintiff's and its sponsoring bank's electronic payment processing system for a period in 2023.

41. At all times relevant here Merchant Entity Bruno Saint, Inc. had a primary business location of 4604 49th Street North, St. Petersburg, Florida 33709. Rachel Bruno, the purported owner of the entity, completed a merchant processing application and agreement with Plaintiff's sponsoring bank that led to this merchant's participation in Plaintiff's and its sponsoring bank's electronic payment processing system for a period in 2023.

42. Rachel Bruno has confirmed that on or about December 21, 2022, she was contacted via Telegram by an individual identified as Jaysen "Jay" Gutierrez, who represented that he was acting on behalf of, and at the direction of, JJG Management LLC, Wellness, and/or Grand Slam Media, and who recruited Bruno to form and operate Bruno Saint, Inc. as a nominee merchant entity.

43. On or about December 27, 2022, and again on March 22, 2023, Bruno, at Gutierrez's direction, executed Corporate Reseller Agreements that expressly transferred all rights in the proceeds of the Bruno Saint, Inc. merchant account to the "Company," stating that Bruno "shall not consider funds as assets, have interest in, or claim to" any funds processed through the account opened in her name or in the name of Bruno Saint, Inc.

44. Gutierrez coached Bruno, via Telegram, on the specific false statements to make to Bruno's bank when opening the merchant account, including instructing

her to represent that she was the sole member of an online health-products business with no employees and a website still under construction. Gutierrez further represented to Bruno that he had already opened bank accounts for over 200 similarly situated individuals under the same model. In exchange, Bruno was promised a flat $750 monthly passive payment and never controlled the traffic generating the electronic payment transactions or the resulting funds that flowed into the bank account she had opened.

45. At all times relevant here Merchant Entity Echylon Jetted Publishing LLC had a primary business location of 3280 Tamiami Trail #228, Port Charlotte, Florida 33953. Elaine Oross, the purported owner of the entity, completed a merchant processing application and agreement with Plaintiff's sponsoring bank that led to this merchant's participation in Plaintiff's and its sponsoring bank's electronic payment processing system for a period in 2023.

46. At all times relevant here Merchant Entity Maverick Viper 101 LLC had a primary business location of 2500 Quantum Lakes Drive, Suite 203, Boynton Beach, Florida 33426. Andrew Mollow, the owner of the entity, completed a merchant processing application and agreement with Plaintiff's sponsoring bank that led to this merchant's participation in Plaintiff's and its sponsoring bank's electronic payment processing system for a period in 2023.

47. At all times relevant here Merchant Entity Melkee Local Venturing LLC had a primary business location of 1150 North Loop 1604W, Suite 108 #154, San Antonio, Texas 78248. Markel Steverson, the purported owner of the entity, completed a merchant processing application and agreement with Plaintiff's sponsoring bank that led to this merchant's participation in Plaintiff's and its sponsoring bank's electronic payment processing system for a period in 2023.

48. At all times relevant here Merchant Entity Wasalina Tea Dreams, LLC

had a primary business location of 23219 Stringtown Road #101, Clarksburg, Massachusetts 01247. William Okattah-Asare, the purported owner of the entity, completed a merchant processing application and agreement with Plaintiff's sponsoring bank that led to this merchant's participation in Plaintiff's and its sponsoring bank's electronic payment processing system for a period in 2023.

49. Arjun Walia and Taha Shaikh are, upon information and belief, Limitless X agents or employees acting within the scope of their agency or employment who participated in the conduct described in this Complaint, including the merchant-ID enrollment and fraud-detection-portal communications described in Sections VI and VIII below. Like the other participants described in this Section, Walia and Shaikh are not named as Defendants in this action.

50. Bruno Saint, Inc. is the fully documented prototype of the nominee shell structure the Enterprise used to obtain merchant-processing access: the same recruitment method, the same form of Corporate Reseller Agreement, and the same $750 monthly flat payment described above were used to create and deploy Melkee Local Venturing LLC, Alacrity Campaign LLC, Wasalina Tea Dreams LLC, Echylon Jetted Publishing LLC, Maverick Viper 101 LLC, and the other Merchant Entities identified above.

51. None of the Merchant Entities or Wellness presently continues to operate as an independent business. This is because each was created solely as a nominee vehicle to obtain merchant-processing access on behalf of Limitless X and Mathur, and, as described in Section V below, Plaintiff has already obtained default judgments against Wellness, Paysuites, and each of the Merchant Entities for the same losses at issue in this action — judgments that further confirm these entities were never created to be long-term independent commercial operations, but rather instrumentalities of the Enterprise that Limitless X and Mathur controlled to commit

payment processing fraud.

## V. PRIOR RELATED JUDGMENTS AGAINST WELLNESS BRANDS, PAYSUITES, AND THE MERCHANT ENTITIES

52. On or about December 23, 2025, in Lace Marketing, LLC d/b/a LeisurePay v. Limitless X Holdings, Inc. et al., Circuit Court of Cook County, Illinois, Case No. 2024-L-014194 (Hon. Stephen A. Swedlow), the court entered default judgments in favor of Plaintiff and against the following defendants, arising from the same merchant-processing activity, chargebacks, and losses at issue in this action:

a. Wellness Brands LLC — $518,824.81

b. Paysuites Group LLC — $519,198.74

c. Maverick Viper 101 LLC — $125,542.33

d. Wasalina Tea Dreams, LLC — $125,275.11

e. Alacrity Campaign LLC — $106,673.79

f. Echylon Jetted Publishing LLC — $94,432.46

g. Melkee Local Venturing LLC — $59,126.63

h. Bruno Saint, Inc. — $9,624.78

53. Mathur was not a defendant in Cook County 2024-L-014194; Limitless was named, beat Illinois personal jurisdiction, and was dismissed; the Cook defaults do not adjudicate either defendant here. Plaintiff brings this action to recover directly from Limitless X and Mathur — the controlling parties who crafted the scheme, directed the Enterprise and who have not been held to account.

54. Plaintiff does not seek a double recovery for any portion of the same injury. Any amounts actually collected or satisfied on the Cook County judgments for the losses at issue here will be credited against any duplicative compensatory recovery obtained in this action, while preserving Plaintiff's separate statutory

remedies against Defendants; however, consistent with the shell-merchants scheme described here, it does not appear that the Merchant Entities continue to operate or that they retained sufficient capital to pay liabilities.

## VI. THE MERCHANT-PROCESSING RELATIONSHIP AND THE SCHEME AS EXECUTED

### A. Plaintiff's ISO Relationship and Referral Agreement with Its Sponsoring Bank

55. Plaintiff is an Independent Sales Organization ("ISO") contractually authorized to offer Credit Card Processing Services by its sponsoring/acquiring bank, a principal issuer and acquirer for the major credit card brands (VISA/MASTERCARD). As an ISO, Plaintiff is registered as a third-party agent to perform services on behalf of the member bank that sponsors its registration.

56. ISOs, including Plaintiff, must follow underwriting criteria intended to prevent cardholder fraud. The underwriting process includes, but is not limited to, monitoring websites, checking the identity and background of a merchant's owners, and reviewing processing history, where available. Based on that underwriting, ISOs often place restrictions on merchant accounts, such as limiting processing volumes (or rejecting them outright).

57. Plaintiff entered into a referral agreement with its sponsoring bank (the "Referral Agreement") pursuant to which Plaintiff agreed to solicit merchants to use the bank's Credit Card Processing Services in exchange for commissions.

58. If Plaintiff introduced an acceptable merchant, the bank and the merchant would enter into a merchant agreement (a "Merchant Agreement").

59. Under a Merchant Agreement, for each credit card transaction processed, a small percentage of the transaction amount is allocated among the card network, the acquiring bank, and the ISO. The remainder is remitted to the merchant.

60. A consumer may dispute the validity of a transaction and demand return of funds for reasons including that goods or services were not received or as described, or that the transaction was not properly authorized or was fraudulent.

61. If the merchant fails to provide evidence that a disputed transaction was legitimate, a "chargeback" occurs, requiring the bank to immediately return the consumer's funds. The bank then attempts to recoup previously paid amounts from the merchant, plus an additional fee. Where the bank cannot recover from the merchant, the result is an "uncollectible chargeback."

62. Although acquiring banks are directly responsible to the card networks for fraud, they commonly pass down card-network fines to ISOs as a matter of standard industry practice. Consistent with that practice, the agreements between Plaintiff and its sponsoring bank require Plaintiff to bear the risk of uncollectible chargebacks and prohibit Plaintiff from retaining commissions earned on fraudulent transactions. Plaintiff also has committed to make its sponsoring bank whole for losses incurred from merchants referred by Plaintiff, including from uncollectible chargebacks. Honoring its commitments has resulted in the losses described in this Complaint.

### B. Paysuites Introduces the Fraudulent Merchant Entities to Plaintiff, at Limitless X's and Mathur's Direction

63. Plaintiff entered into a Sales Representative & Referral Agreement with Paysuites effective June 28, 2023 (the "Paysuites Agreement"), signed on Paysuites's behalf by Mike Wiener.

64. Under the Paysuites Agreement, Paysuites agreed to refer merchants to Plaintiff for Credit Card Processing Services in exchange for a commission, and agreed to comply with Plaintiff's and its sponsoring bank's policies and procedures and applicable card-network and NACHA rules.

65. Upon information and belief, Paysuites acted at the direction of, and for the benefit of, Limitless X and Mathur in referring the Merchant Entities to Plaintiff, and Limitless X and Mathur knew of, authorized, or ratified Paysuites's referral conduct.

66. Paysuites referred the Merchant Entities to Plaintiff for vetting. As part of that process, each Merchant Entity falsely portrayed itself as a legitimate business — a portrayal Plaintiff reasonably relied upon in referring each Merchant Entity to its sponsoring bank.

67. As part of the referral process, each Merchant Entity completed a merchant application and entered into a Merchant Agreement with Plaintiff's sponsoring bank.

68. Unbeknownst to Plaintiff at the time, Limitless X and Mathur, acting through and directing Wellness, Paysuites, and the Merchant Entities, used the Merchant Entities to process fraudulent credit card transactions at the expense of Plaintiff's sponsoring bank and eventually, as a result of Plaintiff's commitments to its sponsoring bank, Plaintiff.

### C. The Fraudulent Scheme to Monetize Stolen Credit Card Information and Unauthorized Charges

69. The Merchant Entities' processing was not consistent with a legitimate, even high-risk, continuity or "nutra" merchants. Within weeks of boarding, the accounts generated chargebacks exceeding $200,000 in a roughly three-week window. That volume, relative to the activity on the accounts, is incompatible with ordinary cardholder "friendly fraud" or an aggressive but disclosed marketing campaign. Plaintiff's sponsoring bank so advised Plaintiff on or about October 6, 2023, after its review indicated the activity included fraudulent use of stolen or unauthorized cardholder data. Cardholders associated with a substantial portion of

those chargebacks reported they had not signed up for the product, did not recognize the merchant, and had not authorized the charge. No Merchant Entity issued refunds on the corresponding Ethoca or Verifi alerts before those items matured into chargebacks. A legitimate merchant with real customers refunds alerts. These accounts did not.

70. While the Merchant Entities acted nominally separately from one another, they employed similar tactics and, upon information and belief, were recruited, organized, set up, funded, and guided by Limitless X and Mathur.

71. Through September 2023, the Merchant Entities' accounts showed only moderate transaction volume.

72. On or about September 19, 2023, a person subsequently identified as a Limitless X employee, acting at Mathur's direction or with his knowledge, wrote to Plaintiff asking to review the active accounts "set up" over the preceding thirty days, referencing Alacrity, Bruno Saint, Echylon, Maverick, and Wasalina Tea. Approximately two weeks earlier, the same employee stated he would restart processing for those entities plus Melkee.

73. The merchant accounts opened under Bruno Saint, Inc. and the other Merchant Entities — including Alacrity Campaign LLC, Maverick Viper 101 LLC, Wasalina Tea Dreams LLC, Echylon Jetted Publishing LLC, and Melkee Local Venturing LLC — were boarded through Paysuites (whose principals include Mike Wiener and Marty Wood). Between August 28 and August 30, 2023, Limitless X personnel, including Arjun Walia (arjun@limitlessx.com) and Taha Shaikh, coordinated directly with Paysuites and with Kount, a third-party chargeback alert and potential fraud-detection vendor, to enroll those specific merchant accounts into the Kount chargeback-mitigation system because they knew payment processing would not commence absent the Merchant Entities enrollment in Kount.

74. Kount is a chargeback-prevention and dispute-management platform owned by Equifax. It is not a bank, processor, or underwriter; rather, merchants and ISOs use Kount to receive Ethoca (Mastercard) and Verifi/CDRN (Visa) prevention alerts and to enroll merchant accounts in Visa Rapid Dispute Resolution so that charges customers dispute can be refunded before they become formal chargebacks that count against the merchant's ID—its so-called "mid." Equifax appears in the communications set forth herein solely because it owns and operates Kount.

75. Kount's alert and dispute-resolution services are subscription-based: a merchant or its ISO enrolls specific merchant IDs in CDRN (Visa/Verifi), Ethoca (Mastercard), and/or RDR, and pays a per-alert fee for each dispute intercepted through those channels. Once enrolled, CDRN and Ethoca notify the merchant of a pending dispute within hours of the cardholder's complaint to the issuing bank, giving the merchant a narrow window — typically 24 to 72 hours — to refund the transaction on its own initiative before the dispute matures into the formal chargeback described above.

76. In this case, however, enrollment in Kount's alert systems was not a discretionary risk-management measure that Limitless X adopted on the Merchant Entities' behalf as a courtesy or convenience. It was a precondition the sponsoring bank imposed before it would authorize the Merchant Entities' MIDs to process transactions at all. As reflected in the August 28–30, 2023 correspondence described below, Kount and Paysuites personnel repeatedly advised Walia and Shaikh that the bank required documented proof that each Merchant Entity's MID was enrolled in RDR and Ethoca, and that, absent such proof, the sponsoring bank would not allow the accounts to go, or remain, live. Limitless X personnel's direct, hands-on management of the Kount enrollment process for all six Merchant Entities — rather than leaving that task to each entity's purported independent owner — accordingly

reflects Limitless X's own recognition that it, and not the nominal merchants, was responsible for satisfying the bank's enrollment requirement in order to keep the entire book of nominee accounts operational.

77. As shown herein, in August–October 2023, Limitless X personnel used Limitless X email addresses to coordinate Kount enrollment and alert handling on the Merchant Entities' accounts, referring to those accounts as "our mids" and to the system as "our kount portal."

78. In an August 28, 2023 email in that chain, Walia (using a "limitlessx.com") email wrote: "melkee will prob be master agreement to invoice. but can we get individual contracts for each corp we registering so that i can show proof to bank? they are pushing rdr n ethoca hard or else gonna shut our mids off." Walia's use of the possessive "our mids" — meaning "our merchant IDs" — is an admission that Limitless X exercised operational control over, and claimed ownership of, the very merchant accounts identified here that generated Plaintiff's losses.

79. In supplying that information, Limitless X personnel also furnished Kount with the complete legal names and registered business addresses of the Merchant Entities — Alacrity Campaign LLC (in Dearborn, Michigan), Bruno Saint, Inc. (in Saint Petersburg, Florida), Echylon Jetted Publishing LLC (in Port Charlotte, Florida), Maverick Viper 101 LLC (in Boynton Beach, Florida), Wasalina Tea Dreams LLC (in Clarksburg, Massachusetts), and Melkee Local Venturing LLC (in San Antonio, Texas). Independent, arm's-length merchants do not furnish their complete corporate formation details to a third party so that the third party can enroll and manage their merchant accounts or their Kount accounts. That Limitless X personnel possessed and volunteered this information to Kount while enrolling the merchants in Kount is further evidence that Limitless X — not the nominal owners of the supposedly independent individual Merchant Entities — exercised operational

control over the Merchant Entities and their accounts involved in electronic payment processing.

80. The following morning, on August 29, 2023, Kount's sales representative replied directly to Walia at his Limitless X email address, attached the underlying chargeback-mitigation services agreement for Melkee Local Venturing for Limitless X's own review and signature via DocuSign, and asked Walia to provide the information for "each corp [he] would like a contract for." Kount thereby treated Walia and Limitless X — rather than the nominal owners of the individual Merchant Entities — as the party with authority to contract for, and control, the chargeback-mitigation services covering those accounts.

81. Consistent with Paysuites's role as an instrumentality of Limitless X and Mathur, Martin Wood of Paysuites received these Kount confirmation materials from Walia on August 29, 2023 and forwarded them the same day to Michael Wiener with instructions to provide them to the bank. Wiener forwarded the Limitless X–Kount correspondence to Plaintiff on August 30, 2023 so Plaintiff could show the sponsoring bank that the MIDs were enrolled in RDR and Ethoca, which the bank required before the accounts could stay live. Receiving proof of a bank-required enrollment is not disclosure that the nominal owners were $750 nominees, that Wellness owned the proceeds, or that Limitless X was on MATCH.

82. Red flags emerged in late September 2023 when the volume of submitted credit card transactions increased rapidly and without a corresponding, legitimate business explanation as to why the volume had so increased.

83. On October 4, 2023, Kount's own portal — labeled "MANAGING MERCHANT: MELKEE LOCAL VENTURING (10568)" — displayed Ethoca alerts whose billing descriptors were not limited to Melkee. Kount personnel exported the Ethoca and Verifi alert file associated with this book and stated that the

only billing descriptor Kount had been given was “for the LimitlessX account.” The same day, Kount’s portal — labeled “MANAGING MERCHANT: MELKEE LOCAL VENTURING (10568)” — displayed alerts whose descriptors were not limited to Melkee and included DYNAMICSKINGLOW, NATURAL EPIDERMIS, WASALINA TEA DREAMS, ALACRITY CAMPAIGN LLC, KETOSIS SLIM, and THE PLAIN KETO. Plaintiff’s CTO contemporaneously identified that book as “the group that is being run by arjun@limitlessx.com” and listed the associated sites and merchant IDs, including powerpunches.com and iconicskinLX.com (Alacrity Campaign LLC), Keto Bets and Great Stride (Bruno Saint Inc.), The Plain Keto, strength-one.com and dynamicskinglow.com (Maverick Viper 101 LLC), Natural Epidermis and Ketosis Slim (Wasalina Tea Dreams LLC), and Melkee Local Venturing LLC. Kount confirmed those descriptors would match in the Melkee portal login. The use of multiple nominee DBAs through a single Limitless X–controlled portal is consistent with load-balancing a fraudulent book, not with independent merchants selling products their own customers ordered as had been represented to Plaintiff.

84. Plaintiff grew suspicious that the accounts had been created for illicit financial gain due to a concerning volume of chargebacks on the Merchant Entities’ accounts. On October 4, 2023, suspicious of fraud, Plaintiff emailed the Merchant Entities and Paysuites expressing its concerns. Plaintiff’s investigation and communications with the Merchant Entities largely went unanswered.

85. As required under the Referral Agreement, Plaintiff issued refunds for charged-back transactions between September 10, 2023 and October 5, 2023.

86. Eventually it became clear that the Merchant Entities were responsible for more than 1,400 chargebacks, with 689 of those chargebacks occurring within a twenty-day window, confirming Plaintiff’s suspicion that these merchants had

misrepresented their intent to engage in legitimate on-line business activities.

87. Plaintiff has attempted to recoup the funds it expended on the Merchant Entities' behalf, but none of its attempts have succeeded, and none of the Merchant Entities, Paysuites, Wellness, Limitless X, or Mathur responded to Plaintiff's requests for reimbursement. Upon information and belief, after they discovered that Plaintiff suspected them of having defrauded it, the Merchant Entities ceased operating.

88. Plaintiff is informed and believes that a substantial portion of the proceeds of the Merchant Entities' fraudulent transactions was forwarded directly to Limitless X and/or Mathur.

89. Plaintiff is further informed and believes that each Merchant Entity entered into an agreement with Wellness — which acted at the direction of and for the benefit of Limitless X and Mathur — under which, in exchange for a small monthly fee, Wellness would open a merchant account for the entity such that the proceeds of that account would flow to Limitless X and/or Mathur, leaving no funds available to pay chargebacks, fines, or penalties.

90. In other words, Limitless X and Mathur created a scheme whereby each Merchant Entity was used, through Wellness and Paysuites as their instrumentalities, to process payments, but the proceeds of those transactions were moved immediately out of the Merchant Entities' accounts, out of reach of Plaintiff and even out of reach of the Merchant Entities themselves, and into the control of Limitless X and Mathur.

91. Plaintiff's investigation of the sudden influx of chargebacks led it to an executive/purported owner of one of the Merchant Entities, Rachel Bruno.

92. Rachel Bruno explained to one of Plaintiff's executives how she was recruited and guided through the process of forming an LLC, setting up email accounts, obtaining a federal Employer Identification Number, and ultimately opening a merchant account through Plaintiff.

93. Rachel Bruno explained that she did not market or even distribute the products shipped to consumers by Limitless X, but was lured to participate in a scheme where she secured payment processing using a shell LLC she was taught to create and hand-over based on a promise of $750 per month in passive income.

94. Individuals were recruited to form the Merchant Entities as limited liability companies. They were guided by Wellness, acting at Limitless X's and Mathur's direction, through the LLC formation process; Wellness then handed the resulting entities to Paysuites, which in turn introduced them to Plaintiff to complete the merchant-account process.

95. In exchange for the promised $750 per month, each recruited individual applied for and maintained a merchant account such that the individual LLC received the proceeds of the fraudulent transactions in its merchant account, subject to the Wellness agreement described in the following paragraph.

96. Wellness's agreement with each Merchant Entity obligated the Merchant Entity to obtain and diligently maintain a merchant account, and contractually required it to follow Wellness's instructions, including that all funds received in the merchant account would be treated as receivables belonging to Wellness. In exchange for $750 per month, each Merchant Entity thus allowed its receipts to be controlled by a party undisclosed to Plaintiff — ultimately, Limitless X and Mathur.

97. Wellness operated on behalf of and as a front for Limitless X and Mathur, and the funds fraudulently obtained by the Merchant Entities were ultimately directed back to Limitless X and Mathur. An employee working with Equifax and its fraud-detection subsidiary, Kount, showed Plaintiff that that the products being run through the Merchant Entities' accounts, and suddenly being flagged by customers as fraudulent charges, were payment transactions using descriptors and other information identifying them as involving products marketed and sold by Limitless

X.

98. By directing the Merchant Entities to be set up and maintained, Limitless X and Mathur caused fraudulent bypassing of card-network rules, bank rules, and Plaintiff's own rules — rules that strictly limit chargeback volume and are designed to guard against the participation of repeat offenders, such as Limitless X, that has itself repeatedly been accused of charging customers for products after they tried to cancel and/or charging them for products customers said did not work or were otherwise misrepresented.

99. Using multiple Merchant Entities facilitated the fraud by allowing the fraudulent transactions to be spread out, or "load balanced," among accounts, diluting the chargeback rate attributable to any single account and evading the limits Plaintiff and its sponsoring bank impose on chargeback volume. Knowing this, Limitless X and Mathur directed fraudulent orders to various accounts specifically to spread out the resulting chargebacks.

100. When Plaintiff began investigating the escalating chargebacks in October 2023, Paysuites introduced to Plaintiff an individual using the name "Blake Frost" as a purported intermediary. Upon information and belief, Frost acted at the direction of, or in concert with, Limitless X and/or Mathur, and pretended to be a helpful intermediary while in reality making only empty promises of repayment, prolonging the Merchant Entities' ability to continue submitting fraudulent transactions.

101. "Frost" made repeated assurances, including a promise of a $100,000 "good-faith payment," that consistently fell through. He then became unresponsive, while Plaintiff and its sponsoring bank continued to receive daily chargebacks that pushed Plaintiff's total losses over $500,000.

102. On information and belief, the individual using the name "Blake Frost"

(who communicated using the email address blakef542@gmail.com) is an alias used by, or at the direction of, Defendant Jaspreet Mathur.

103. Between approximately October 16 and October 18, 2023, while the Merchant Entities' accounts continued to generate daily chargebacks and NSFs, the individual using the "Blake Frost" identity exchanged extensive written communications with Plaintiff's representatives concerning the Merchant Entities, the outstanding losses, and potential resolution, demonstrating detailed knowledge of the entities and their exposure and coordinating proposed settlement terms in concert with Martin Wood of Paysuites.

104. In those October 16–18, 2023 communications, "Frost" explicitly referenced Limitless X and Jas Mathur by name, stated that he had searched the term "Jas Mathur fraud," and discussed Mathur's public profile — facts that, together with Frost's detailed knowledge of the Merchant Entities and his coordination with Paysuites, further support Plaintiff's information and belief that "Blake Frost" was Mathur himself, or someone acting at his direction and with his knowledge and authority.

105. In or around late September 2023, the scheme began to come to light when Plaintiff's sponsoring bank notified Plaintiff that it had received a startling number of chargebacks associated with the several Paysuites-referred merchant accounts. Despite the high volume of chargebacks, not a single refund was processed for any consumer by any Merchant Entity, confirming each entity's illegitimacy and leaving Plaintiff to absorb the consequences.

106. Together with its sponsoring bank, Plaintiff took immediate steps to reduce the Merchant Entities' ability to submit further transactions.

107. On October 4, 2023, Plaintiff wrote to Paysuites demanding that Paysuites recognize the gravity of the situation and provide a written plan setting out

immediate steps to rectify it and reduce future fraudulent transactions by the Merchant Entities. No responsive action was taken by Paysuites, the Merchant Entities, Limitless X, or Mathur.

108. Also on October 4, 2023, Plaintiff's third-party fraud-detection vendor wrote to the Limitless X personnel with whom it had previously communicated, informing them that incoming fraud alerts were not being refunded, and reminded them that such alerts must be refunded promptly to prevent them from proceeding to chargeback status.

109. On October 6, 2023, Plaintiff again wrote to Paysuites, advising that chargebacks during the period from approximately September 8 through the end of that month had exceeded $200,000, primarily from Mastercard transactions, and that Plaintiff's analysis indicated the chargebacks were attributable to fraudulent activity, including the use of stolen credit card data.

110. On October 10, 2023, Paysuites — acting, upon information and belief, at Limitless X's and Mathur's direction — emailed Plaintiff promising to assist in ending the fraudulent transactions. This representation was false when made and was intended to, and did, induce Plaintiff to allow the Merchant Entities' accounts to remain open for more time, resulting in additional fraudulent transactions.

111. Despite that email, no meaningful corrective action was taken.

112. On October 12, 2023, Paysuites sent Plaintiff an email representing that its "client" — upon information and belief, Limitless X and Mathur, or another front entity acting on their behalf — had stated it would review the numbers, present an analysis, and "be prepared to fund all accounts accordingly," with a "one day turn around" expected to resolve the matter for all parties. This representation was false when made: the accounts were never funded, and the promised analysis was never sent.

113. As one non-exhaustive example of how Paysuites's October 12, 2023 email enabled the fraud to continue, on October 17, 2023 alone, another 34 chargebacks were received.

114. As of the filing of this Complaint, Plaintiff's damages and losses are at least $520,675.10.

115. None of the Merchant Entities has, or ever had, any right to be compensated for the fraudulent transactions they submitted.

116. In total, Plaintiff has determined that over 1,400 fraudulent transactions were submitted by the Merchant Entities for the benefit of Limitless X and Mathur, resulting in a loss to Plaintiff of at least $520,675.10.

**D. Mathur's Direction and Control of the Scheme**

117. Mathur, as Chairman and Chief Executive Officer of Limitless X, exercised operational control over Limitless X and, upon information and belief, personally directed, authorized, or knowingly permitted the recruitment of the Merchant Entities, the use of Wellness to obtain contractual control over their processing proceeds, and the routing of those proceeds to accounts benefiting Limitless X and/or Mathur personally.

118. Upon information and belief, Mathur was aware, no later than the events described in Section VI(C) above, that Limitless X could not obtain merchant processing accounts in its own name because of its placement on the Terminated Merchant File, and that the Merchant Entity structure existed specifically to circumvent that restriction.

119. Limitless X employees identified in Plaintiff's communications, including Arjun Walia and Taha Shaikh, reported to and acted at the direction of Mathur in his capacity as Chief Executive Officer.

120. Mathur, individually and through Limitless X, was the primary financial

beneficiary of the scheme, receiving or directing the receipt of the proceeds of the fraudulent transactions described herein after those proceeds were swept from the Merchant Entities' bank accounts.

121. Wellness, Paysuites, and each of the Merchant Entities acted as agents, instrumentalities, and/or co-conspirators of Limitless X and Mathur in furtherance of the scheme, such that their conduct, described throughout this Complaint, is attributable to Limitless X and Mathur under ordinary principles of agency and civil conspiracy law.

### E. Continuing Diversion and Dissipation of Assets

122. The structure of the scheme — under which proceeds were contractually and mechanically diverted out of each Merchant Entity's account immediately upon receipt — left no reserves against which Plaintiff could recover its losses through ordinary chargeback and collection processes.

123. Upon information and belief, Limitless X and Mathur continue to control and have access to the diverted proceeds of the fraudulent transactions described herein, and have taken no steps to segregate, preserve, or account for those funds notwithstanding Plaintiff's repeated demands for their restitution.

### F. Additional Public-Record Evidence of a Recurring Pattern by Limitless X and Mathur

124. The allegations in this subsection are drawn from public court filings, dockets, and SEC filings, not from Plaintiff's own dealings with Defendants. They are pled to support the pattern, intent, and RICO continuity elements of Plaintiff's claims and to rebut any suggestion that the scheme described above was an isolated, single-victim occurrence. The findings in the CardFlex matter described below are adjudicated findings of the United States District Court for the District of Nevada, reached after full briefing and oral argument, though Limitless X and Mathur were

not parties to that action and are not bound by them. The remaining matters described in this subsection involve allegations made by others that have not been adjudicated, and Plaintiff includes them for their evidentiary and notice value, not as adjudicated facts.

125. In FTC v. CardFlex, Inc. (n/k/a Cliq, Inc.), et al., No. 3:14-cv-00397 (D. Nev.), the Federal Trade Commission moved on December 15, 2025 to hold Cliq, Inc. and its principals in contempt of a 2015 consent order for, among other things, processing payments for Limitless X (operating as Emblaze One Inc. d/b/a Limitless X) after Limitless X was added to Mastercard's MATCH list in April 2021 for illegal transactions — the same type of industry blacklisting alleged with respect to the Terminated Merchant File in this case — and for working with Mathur to conceal his identity as the entities' control person from underwriters and banks in order to keep obtaining merchant accounts. On May 13, 2026, the United States District Court for the District of Nevada (Du, J.) granted the FTC's motion in relevant part, finding by clear and convincing evidence that Cliq's processing for Limitless X violated the consent order's prohibitions on processing for MATCH-listed merchants and on assisting clients in evading fraud-detection programs.

126. The Court's order specifically found that, after Limitless X's merchant accounts were terminated in May 2021 because of chargeback rates and a finding that transactions had been miscoded as unrelated goods, Mathur and Limitless X personnel obtained replacement merchant accounts under approximately 38 shell-company names collectively referred to internally as the "Wellington Group," none of which disclosed Mathur's or Limitless X's involvement on the merchant applications, and that the payment processor's own personnel knew the Wellington Group accounts were in fact controlled by Mathur and Limitless X. The Court rejected Mathur's and the processor's argument that Limitless X's MATCH listing

was erroneous and could be independently second-guessed, holding that a processor is not entitled to conduct its own investigation and decide that a MATCH listing is pretextual.

127. The Court further found that funds from the Wellington Group accounts were directed to Limitless X's own bank accounts, that Mathur personally instructed the processor on the handling of those accounts, and that this arrangement allowed Limitless X and Mathur to process at least $71,694,998 in transactions after Limitless X's MATCH listing (and $125,953,463 in combined Wellington Group and Limitless X processing), generating hundreds of consumer complaints of deceptive sales practices.

128. The structure the Court found in the CardFlex matter is materially identical to the structure Plaintiff alleges in this case, involving the same principal (Mathur) and the same corporate vehicle (Limitless X), deployed against a different payment processor over a materially overlapping period (2020 through at least 2023): in both instances (a) Limitless X's own name and processing history had become a liability to obtaining merchant accounts — the Terminated Merchant File here, the MATCH list there; (b) Mathur caused a series of nominally independent entities to be formed or obtained specifically to secure merchant processing access that Limitless X could not obtain directly — the Merchant Entities and Wellness here, the "Wellington Group" there; (c) those entities' applications did not disclose Mathur's or Limitless X's true ownership or control, despite the underwriter directly asking for that information; (d) the resulting transaction proceeds were directed back to Limitless X and/or Mathur rather than retained by the nominal merchant entities; and (e) when an entity's fraud was detected or its account closed, Limitless X and Mathur caused a replacement entity or account to be opened rather than ceasing the underlying conduct. This is not a coincidental resemblance, and Plaintiff pleads these

findings to support the pattern, intent, and open-ended continuity elements of its RICO claims, and to rebut any suggestion that the scheme against Plaintiff was an isolated occurrence rather than one iteration of a recurring operation.

129. Limitless X, Mathur, and entities associated with them have also been named as defendants or respondents in other proceedings that are matters of public record. These include: (a) Harpo, Inc. and OW Licensing Company LLC v. Emblaze One, Inc., et al., No. 2:23-cv-04459 (C.D. Cal.), filed June 7, 2023, which alleged trademark infringement, dilution, false advertising, unfair competition, and violation of the right of publicity arising from the alleged unauthorized use of Oprah Winfrey's name, image, and intellectual property in advertising for products associated with Limitless X; (b) Mentom Eyewear, Inc. v. Limitless X Holdings, Inc., et al., No. 23STCV24681 (Los Angeles County Superior Court), filed October 10, 2023, which asserted contract and related claims against Limitless X Holdings, Mathur and others and was subsequently dismissed without prejudice; and (c) In re Ex Parte Application of 2770095 Ontario Inc., No. 2:21-mc-01004 (C.D. Cal.), in which 2770095 Ontario sought discovery pursuant to 28 U.S.C. § 1782 from Mathur and eMblaze ONE Inc. for use in foreign proceedings concerning an approximately $1.11 million loss allegedly suffered by Mexican payment company Affinitas Medios de Pago in an alleged fraud scheme. Plaintiff pleads the existence and allegations of these proceedings for their notice and evidentiary value and does not allege that unadjudicated allegations in those proceedings have been established as fact.

130. Argyle Payments, LLC v. Limitless X Holdings, Inc., et al., No. 30-2024-01397998 (Orange County Superior Court), is another particularly relevant lawsuit because that commercial dispute named as defendants Limitless X Holdings, Mathur, and numerous merchant entities, including Bruno Saint Inc., Echylon Jetted Publishing LLC, and Wasalina Tea Dreams LLC—three of the same Merchant

Entities involved in the conduct alleged in this Complaint. The Argyle complaint alleges a structure materially identical to the one alleged here: that Limitless X, "not having a merchant account of its own," used a network of nominally independent straw merchants—each presented to the payment processor as an individually owned, legitimate business—to process transactions on Limitless X's behalf, with the proceeds of those transactions routed directly to Limitless X rather than retained by the nominal merchants; that Mathur "assists businesses, including Limitless X, in obtaining electronic payment processing services that they could not legitimately obtain due to the ISO's and bank's underwriting criteria"; and that multiple merchant accounts were used simultaneously to "load balance" transaction volume and chargebacks across accounts specifically to prevent any single account's chargeback ratio from triggering the restrictions that Limitless X's own processing history would otherwise have caused. Plaintiff alleges this overlap—in participants, in merchant entities, and in the underlying mechanism of using shell merchants to obtain and spread processing access that Limitless X could not obtain or sustain in its own name—as additional evidence relevant to the existence and continuity of the alleged Enterprise and to whether the scheme perpetrated against Plaintiff was isolated or recurring.

131. Documents filed in the Argyle action indicate that it was resolved pre-Answer on terms under which Limitless X agreed to pay Argyle approximately $200,000 to settle claimed damages of approximately $300,000 — a rapid resolution of a claim seeking treble damages and alleging a nearly identical shell-merchant processing mechanism as occurred here.

132. Limitless X's own SEC filings reflect recent financial-reporting difficulties consistent with the undercapitalization alleged in Section III above: on March 31, 2026, Limitless X filed a Rule 12b-25 notice that it could not timely file its

Form 10-K for fiscal year 2025 because it and its independent auditor needed additional time to complete and review its financial statements, and on May 15, 2026, Limitless X filed a further Rule 12b-25 notice that it could not timely file its Form 10-Q for the quarter ended March 31, 2026, for similar reasons.

## VII. RICO ENTERPRISE ALLEGATIONS

133. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

134. Limitless X, Mathur, Wellness, Paysuites, and the Merchant Entities constitute an association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"), distinct from any pattern of racketeering activity in which its members engaged. Only Limitless X and Mathur are named as Defendants; Wellness, Paysuites, and the Merchant Entities are alleged to be members of the Enterprise and agents or co-conspirators of Defendants, but are not themselves sued here.

135. The Enterprise had a common purpose: to obtain and maintain access to credit card processing systems that Limitless X could not obtain in its own name, to process fraudulent transactions through that access, and to divert the resulting proceeds to Limitless X and Mathur while shifting the resulting chargeback and fraud liability onto Plaintiff and its sponsoring bank.

136. The Enterprise had an ongoing organization and functioned as a continuing unit, with defined roles among its members:

137. Limitless X and Mathur directed and controlled the Enterprise and were its primary financial beneficiaries;

138. Wellness recruited individuals to form nominally independent merchant entities and, through its Corporate Reseller-type agreements, secured contractual control over the proceeds of those entities' merchant accounts, acting as Limitless

X's and Mathur's instrumentality;

139. Paysuites served as the referral and onboarding conduit that introduced the Merchant Entities to Plaintiff and, after the fraud was discovered, made repeated false assurances to Plaintiff to keep the fraudulent accounts open, acting at Limitless X's and Mathur's direction; and

140. The Merchant Entities served as the execution layer, submitting the fraudulent transactions and lending an appearance of legitimacy to the scheme.

141. The Enterprise had sufficient longevity to pursue its purpose, operating continuously from at least June 2023 through October 2023 and, upon information and belief, continuing thereafter through the retention and use of the diverted proceeds.

142. Limitless X and Mathur each conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c) and consistent with the operation-or-management test of Reves v. Ernst & Young, 507 U.S. 170 (1993), by directing the Enterprise's formation, personnel, and fund flows, including through their control of Wellness, Paysuites, and the Merchant Entities.

143. The December 27, 2022 and March 22, 2023 Corporate Reseller Agreements executed by Rachel Bruno, the Telegram records reflecting Gutierrez's coaching of Bruno on false statements to her bank, the Paysuites merchant-boarding communications, the August 28, 2023 Kount enrollment email containing Walia's "our mids" admission, and the "Blake Frost" settlement communications collectively demonstrate that Mathur, through Limitless X and its agents, operated and managed the Enterprise's use of straw merchant accounts to process unauthorized card-not-present transactions, conceal the true nature of the underlying traffic, and divert the resulting proceeds.

144. Limitless X and Mathur are each a "person" within the meaning of 18 U.S.C. § 1961(3) and are distinct from the Enterprise. The Enterprise is not merely Limitless X operating through its ordinary employees or internal corporate departments. It includes separately organized and separately owned participants — Wellness, Paysuites, and the Merchant Entities — that maintained their own legal identities, agreements, bank or merchant accounts, and specialized roles in recruiting nominees, referring merchants, obtaining processing access, and receiving or diverting processing proceeds. Those participants associated with Limitless X and Mathur for the common purpose alleged herein, and their participation gave the Enterprise an existence and structure distinct from either Defendant alone.

## VIII. PATTERN OF RACKETEERING ACTIVITY— PREDICATE ACTS OF WIRE FRAUD

145. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

146. Limitless X and Mathur devised and participated in a scheme to defraud Plaintiff, and to obtain money and property from Plaintiff by means of materially false and fraudulent pretenses, representations, and omissions, and, in furtherance of that scheme, personally and through their agents Wellness, Paysuites, and the Merchant Entities, transmitted or caused to be transmitted by means of wire communication in interstate commerce the writings, signals, and transaction data described below, in violation of 18 U.S.C. § 1343.

147. The following are the presently identified predicate acts of wire fraud, each committed by Wellness, Paysuites, and/or the Merchant Entities as agents of, at the direction of, and for the benefit of, Limitless X and Mathur, or committed directly by Limitless X or Mathur. Plaintiff will identify additional predicate acts, including those within Defendants' exclusive knowledge and control, through discovery. The

Schedule is a summary only and is incorporated into, and should be read together with, the detailed allegations that follow.

**SCHEDULE A — PRESENTLY IDENTIFIED RICO PREDICATE ACTS**

| Act | Date / Wire | Sender → Recipient | Misrepresentation / Use of Wire | Role / Injury Nexus |
|---|---|---|---|---|
| 1 | June–Sept. 2023 Electronic merchant applications | Merchant Entities → Plaintiff / sponsoring bank | Applications presented nominee entities as legitimate, independently owned merchants and omitted nominee status, Wellness control of proceeds, Limitless X operational involvement, and intended use of the accounts. | Boarding of Alacrity, Bruno Saint, Echylon, Maverick, Melkee, and Wasalina; accounts allegedly would not have been boarded had concealed facts been disclosed. |
| 2 | Sept. 19, 2023 Email | Limitless X employee → Plaintiff | Referenced "active accounts" Limitless X had "set up" during the prior 30 days, including Alacrity, Bruno Saint, Echylon, Maverick, and Wasalina; alleged as coordination of the concealed common merchant structure. | Supports alleged Limitless X/Mathur direction and control of nominally independent merchant accounts. |

| Act | Date / Wire | Sender → Recipient | Misrepresentation / Use of Wire | Role / Injury Nexus |
|---|---|---|---|---|
| 3 | Aug. 28–30, 2023 Emails / electronic enrollment | Arjun Walia / Taha Shaikh (Limitless X) → Paysuites / Kount | Coordinated Kount enrollment for Bruno Saint and other Merchant IDs; Walia stated Kount was "pushing rdr n ethoca hard or else gonna shut our mids off." | Alleged operational control over Merchant IDs and chargeback-mitigation systems; furthered continued processing. |
| 4 | Sept. 10–Oct 5, 2023 Payment-network transmission | Merchant Entities, allegedly caused by Limitless X / Mathur → interstate payment networks | More than 1,400 allegedly fraudulent credit-card transaction submissions, including stolen or unauthorized cardholder data; 689 allegedly occurred within a 20-day period. | Each transaction transmission alleged as a separate interstate wire; generated chargebacks, fees, and penalties borne by Plaintiff. |
| 5 | Oct. 4, 2023 Email communicati ons | Paysuites and/or Limitless X personnel → Plaintiff | Minimized or denied fraudulent activity on the Merchant Entity accounts despite the alleged ongoing fraud. | Allegedly intended to delay suspension and permit additional processing and resulting chargebacks. |

| **Act** | **Date / Wire** | **Sender → Recipient** | **Misrepresentation / Use of Wire** | **Role / Injury Nexus** |
|---|---|---|---|---|
| 6 | Oct. 10, 2023 Email | Paysuites, alleged agent of Limitless X / Mathur → Plaintiff | Represented that Paysuites would assist in ending the fraudulent transactions and that corrective measures were forthcoming. | Alleged false remediation promise; fraudulent transactions allegedly continued thereafter. |
| 7 | Oct. 12, 2023 Email | Paysuites → Plaintiff, conveying statement of its alleged "client" | Represented that the client would review the numbers, provide written analysis, and "be prepared to fund all accounts accordingly," with a "one day turn around." | No funding or analysis allegedly followed; Plaintiff kept accounts open and alleges 34 additional chargebacks on Oct. 17. |
| 8 | Beginning Oct. 2023 Emails / electronic communications | "Blake Frost" → Plaintiff | False repayment assurances, including a promised $100,000 "good-faith payment" that allegedly was never made. | Frost alleged to be Mathur or to act at his direction; assurances allegedly prolonged activity and delayed recovery efforts. |

| Act | Date / Wire | Sender → Recipient | Misrepresentation / Use of Wire | Role / Injury Nexus |
|---|---|---|---|---|
| 9 | Beginning no later than Sept. 2023 and continuing Electronic fund transfers | Limitless X / Mathur, through Enterprise participants → accounts controlled by or benefiting Limitless X / Mathur | Electronic diversion of proceeds from Merchant Entity accounts through interstate banking and payment-processing systems. | Allegedly deprived Plaintiff of funds available to satisfy resulting chargeback liabilities and furthered the scheme's economic objective. |

**Predicate Act 1 — Fraudulent Merchant Applications (June–September 2023)**

148. Between approximately June and September 2023, each Merchant Entity, acting as an instrumentality of Limitless X and Mathur, electronically submitted over interstate wires to Plaintiff a merchant application and supporting materials for underwriting. Those submissions represented, expressly or by the required disclosures, that the applicant was a legitimate, independently owned and operated merchant seeking processing for its own business. The submissions omitted the material facts that the applicant had been recruited as a nominee; that Wellness exercised contractual control over the proceeds; that Limitless X personnel would manage or coordinate the merchant IDs and chargeback-mitigation systems; and that the processing relationship was being obtained for the benefit of Limitless X and Mathur. The applications included those submitted in the names of Alacrity

Campaign LLC, Bruno Saint, Inc., Echylon Jetted Publishing LLC, Maverick Viper 101 LLC, Melkee Local Venturing LLC, and Wasalina Tea Dreams LLC, whose nominal owners and business addresses are identified in Section IV above. Plaintiff relied upon the applications and omissions in submitting the merchants to its sponsoring bank for approval.

**Predicate Act 2 — September 19, 2023 Communication**

149. On or about September 19, 2023, a Limitless X employee, acting at Mathur's direction or with his knowledge, transmitted an email to Plaintiff over interstate wires referencing the "active accounts" Limitless X had "set up" in the preceding thirty days, including Alacrity, Bruno Saint, Echylon, Maverick, and Wasalina Tea — a communication that, upon information and belief, was intended to coordinate the fraudulent scheme rather than to describe legitimate merchant relationships.

**Predicate Act 3 — Paysuites/Kount Merchant-Enrollment Communications (August 28–30, 2023)**

150. Between August 28 and August 30, 2023, Limitless X and Mathur, acting through personnel Arjun Walia and Taha Shaikh, transmitted electronic communications over interstate wires to Paysuites and to Kount, Plaintiff's third-party fraud-detection vendor, coordinating the enrollment of the Bruno Saint, Inc. and other Merchant Entities' merchant IDs into the RDR, Ethoca, and CDRN chargeback-mitigation systems. In an August 28, 2023 email, Walia stated that Kount was "pushing rdr n ethoca hard or else gonna shut our mids off," an admission that Limitless X exercised operational control over, and claimed ownership of, those merchant accounts. This coordination was carried out through interstate electronic communications and constituted a discrete act in furtherance of the scheme.

**Predicate Act 4 — Fraudulent Transaction Submissions**

**(September 10 – October 5, 2023)**

151. Between approximately September 10, 2023 and October 5, 2023, Limitless X and Mathur, through the Merchant Entities, caused the transmission, through interstate payment-processing networks, of more than 1,400 fraudulent credit card transactions, including transactions using stolen or unauthorized cardholder data, with 689 such transactions occurring within a single twenty-day period. For example, the same masked PAN 549460XXXXXX5552 charged Alacrity Campaign LLC MID 0675900000053884 $29.95 on September 19, 2023 and Wasalina Tea Dreams LLC MID 0675900000058586 $169.95 on September 21, 2023, both "No Cardholder Authorization."

152. Each transmission of a fraudulent transaction for authorization and settlement constituted a separate use of interstate wires in furtherance of the scheme.

**Predicate Act 5 — October 4, 2023 Communication (Denial of Fraud)**

153. On or about October 4, 2023, Limitless X and Mathur, acting through Paysuites and/or Limitless X personnel, transmitted email communications to Plaintiff over interstate wires that minimized or denied the existence of fraudulent activity on the Merchant Entities' accounts. These statements were false when made and were intended to induce Plaintiff to refrain from suspending the accounts, thereby enabling additional fraudulent transactions to be processed.

**Predicate Act 6 — October 10, 2023 Communication (False Remediation Promise)**

154. On or about October 10, 2023, Paysuites, acting as Limitless X's and Mathur's agent, transmitted an email to Plaintiff over interstate wires stating that Paysuites would assist in ending the fraudulent transactions and that corrective measures were forthcoming. This representation was false when made because

Limitless X and Mathur had no intention of ceasing the scheme, and fraudulent transactions in fact continued after this communication.

**Predicate Act 7 — October 12, 2023 Communication (False Funding Promise)**

155. On or about October 12, 2023, Paysuites, acting as Limitless X's and Mathur's agent, transmitted an email to Plaintiff over interstate wires stating, in substance, that its "client" — upon information and belief, Limitless X or Mathur — had represented that it would review the numbers, provide a written analysis, and "be prepared to fund all accounts accordingly," with a "one day turn around" expected to resolve the matter for all parties. This representation was materially false when made: the accounts were never funded, and the promised analysis was never provided. Plaintiff relied on this representation in allowing the accounts to remain open, during which time additional fraudulent transactions and chargebacks occurred, including 34 additional chargebacks on October 17, 2023 alone.

**Predicate Act 8 — "Blake Frost" Communications (October 2023)**

156. Beginning in or about October 2023, an individual identifying himself as "Blake Frost," upon information and belief acting at the direction of or in concert with Limitless X and/or Mathur, transmitted communications over interstate wires to Plaintiff containing false assurances of repayment, including a promised $100,000 "good-faith payment" that was never made. These communications were false when made and were intended to, and did, prolong the period during which the Merchant Entities' accounts remained active and continued to process fraudulent transactions.

157. On information and belief, "Blake Frost" (using the email address blakef542@gmail.com) was Mathur or acted at Mathur's direction and with his knowledge and authority. That inference is supported by Frost's detailed knowledge

of the Merchant Entities and their aggregate exposure, his coordination of proposed resolution terms with Martin Wood of Paysuites, his express references to Limitless X and Mathur, and his appearance as an intermediary only after Plaintiff confronted the participants concerning the mounting chargebacks, as alleged in paragraphs 101–105 above.

**Predicate Act 9 — Diversion of Fraud Proceeds (Ongoing)**

158. Beginning no later than September 2023 and continuing thereafter, Limitless X and Mathur caused the electronic transfer, through interstate banking and payment-processing systems, of the proceeds of the fraudulent transactions described herein out of the Merchant Entities' accounts and into accounts controlled by or for the benefit of Limitless X and/or Mathur, with the intent to deprive Plaintiff of any source of recovery for the resulting chargebacks.

159. The predicate acts described above are related to one another in that they share a common purpose (obtaining and exploiting merchant processing access to monetize stolen credit card information while shifting liability to Plaintiff), common direction (Limitless X and Mathur), common instrumentalities (Wellness, Paysuites, and the Merchant Entities), a common victim (Plaintiff and, derivatively, its sponsoring bank and defrauded cardholders), and common methods (recruitment of nominee merchants, concealment of true control, fraudulent transaction submission, and false assurances to forestall detection).

160. The predicate acts further support closed-ended continuity because they were repeated through multiple merchant entities, multiple false communications, and more than 1,400 fraudulent transaction submissions. Plaintiff pleads this closed-ended theory in the alternative; the principal continuity theory is open-ended continuity based on the Enterprise's recurring method of obtaining and replacing nominee merchant accounts and the threat that this method would continue so long as

payment-processing access remained available.

161. The predicate acts demonstrate open-ended continuity because the racketeering conduct was not a finite means of accomplishing a single transaction. The Enterprise's method of operation contemplated repeated racketeering acts: nominee merchants were recruited and boarded to conceal Limitless X's control; transaction traffic was spread among those accounts; and accounts impaired by fraud detection, excessive chargebacks, suspension, or termination could be replaced by newly organized nominee merchants. Absent detection and intervention, that structure was inherently capable of repetition against Plaintiff and other ISOs or payment processors.

162. Open-ended continuity is further supported by the public-record evidence described in Section VI(F). That evidence reflects the alleged use by Limitless X and Mathur of materially similar merchant-processing structures involving nominally separate merchant entities across different processors and over multiple years. In addition to the CardFlex evidence described above, the later Argyle Payments action named Limitless X, Mathur, and Bruno Saint Inc., Echylon Jetted Publishing LLC, and Wasalina Tea Dreams LLC—three of the same Merchant Entities involved in the scheme alleged here. The recurrence of the same participants and merchant entities in separate payment-processing relationships supports the inference that the Enterprise's use of nominee merchants was a repeatable method of operation rather than a finite scheme directed solely at Plaintiff. Plaintiff relies upon this public-record evidence for continuity, knowledge, and intent, and not as proof that unadjudicated allegations in those proceedings are true.

163. Plaintiff's injury — the chargeback, fee, and penalty liability it contractually agreed to absorb — flowed directly and foreseeably from the predicate acts described above, without any intervening cause. Had the Merchant Entities

truthfully disclosed their nominee status, Limitless X's and Mathur's operational involvement and economic benefit, the undisclosed control over processing proceeds, and the intended use of the accounts, Plaintiff would not have submitted the Merchant Entities for approval and its sponsoring bank would not have boarded them. Without the fraudulent procurement and continued use of those accounts, the transactions and resulting chargeback liabilities that injured Plaintiff would not have occurred.

## IX. CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF RICO – 18 U.S.C. § 1962(c)
### (Against Limitless X and Mathur)

164. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

165. The Enterprise described in Section VII above is an "enterprise" engaged in, and the activities of which affect, interstate commerce, within the meaning of 18 U.S.C. § 1961(4).

166. Limitless X and Mathur are each a "person" within the meaning of 18 U.S.C. § 1961(3).

167. Limitless X and Mathur each conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of the predicate acts of wire fraud described in Section VIII above, in violation of 18 U.S.C. § 1962(c).

168. Defendants' pattern of racketeering activity was the direct and proximate cause of injury to Plaintiff's business and property, including the chargeback, fee,

and penalty liability described herein.

169. As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property in an amount to be proven at trial, but no less than $520,675.10.

170. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover three times its actual damages, together with the costs of suit, including reasonable attorneys' fees.

**COUNT II – RICO CONSPIRACY – 18 U.S.C. § 1962(d)**

**(Against Limitless X and Mathur)**

171. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

172. Limitless X and Mathur knowingly agreed with each other, and with Wellness, Paysuites, and the Merchant Entities, to further the Enterprise's overall objective of obtaining and maintaining merchant-processing access through nominee merchants while concealing Limitless X's and Mathur's control and economic benefit. The agreement is plausibly inferred from the coordinated recruitment and reseller agreements, Paysuites's merchant referrals, Limitless X personnel's centralized management of the Merchant Entities' Kount enrollments and merchant IDs, the routing of processing proceeds, and the coordinated remediation and repayment communications alleged above.

173. Each Defendant knew that the wire-fraud predicate acts described in Section VIII above were part of the Enterprise's pattern of racketeering activity, knew the essential nature and scope of the scheme, and agreed that members of the Enterprise would commit predicate acts necessary to accomplish its common

objective, in violation of 18 U.S.C. § 1962(d).

174. As a direct and proximate result of Defendants' conspiracy in violation of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business and property in an amount to be proven at trial, but no less than $520,675.10, and is entitled to treble damages, costs, and attorneys' fees under 18 U.S.C. § 1964(c).

## COUNT III – FRAUD
## (Against Limitless X and Mathur)

175. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

176. Limitless X and Mathur, directly and through their agents Wellness, Paysuites, and the Merchant Entities, made false representations and omissions to Plaintiff regarding the legitimacy, ownership, and control of the Merchant Entities, and regarding the existence and progress of remediation efforts once the fraud was discovered.

177. As to Mathur individually, Plaintiff incorporates the particularized allegations above concerning his direction, authorization, and control of the nominee-merchant structure and the acts of Wellness, Paysuites, the Merchant Entities, and Limitless X personnel, including the allegations that those participants acted at his direction or for his benefit, that Limitless X personnel centrally managed the Merchant Entities' merchant IDs and chargeback-mitigation systems, that processing proceeds were routed for the benefit of Limitless X and/or Mathur, and that the "Blake Frost" communications were made by Mathur or at his direction and with his knowledge and authority. Plaintiff alleges that Mathur personally participated in, authorized, directed, or knowingly caused the fraudulent representations, omissions,

and interstate communications identified in Section VIII and Schedule A, rather than merely acting in his capacity as an officer of Limitless X.

178. Each Merchant Entity, by participating in Plaintiff's vetting process before onboarding, implicitly and expressly warranted to Plaintiff — at Limitless X's and Mathur's direction — that it was a legitimate, stand-alone business in need of legitimate payment processing. None of the applications disclosed the Merchant Entities' true ownership and control relationship with Wellness, Limitless X, or Mathur, despite being affirmatively asked to disclose such relationships.

179. Based on these false representations, Plaintiff introduced each Merchant Entity to its sponsoring bank and provided Credit Card Processing Services to each.

180. Limitless X and Mathur knew, at the time each of these representations was made, that they had no intention of ensuring performance of the obligations the representations implied, including the obligation to pay chargebacks, fines, and penalties.

181. Limitless X and Mathur retained, or caused to be retained on their behalf, the proceeds of the fraudulent transactions, leaving Plaintiff responsible for chargebacks, penalties, and fees owed to its sponsoring bank, and have not reimbursed Plaintiff for any of these amounts.

182. Plaintiff justifiably and reasonably relied on Defendants' false representations to its detriment when it introduced the Merchant Entities to its sponsoring bank and continued to process transactions on their behalf, including in reliance on the October 10 and October 12, 2023 communications described above.

183. Defendants' fraudulent intent is further evidenced by the failure of Defendants and their agents to respond to Plaintiff's repeated attempts to seek reimbursement.

184. As a direct and proximate result of Defendants' false representations and

fraudulent conduct, Plaintiff has been damaged in an amount to be proven at trial, but no less than $520,675.10.

185. Defendants' conduct was undertaken with the intent to injure Plaintiff, or with willful and conscious disregard of Plaintiff's rights, and constitutes malicious, oppressive, and fraudulent conduct entitling Plaintiff to an award of punitive damages in an amount sufficient to deter similar conduct.

**COUNT IV – CIVIL CONSPIRACY**

**(Against Limitless X and Mathur)**

186. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

187. Limitless X and Mathur agreed with each other, and with non-party co-conspirators Wellness, Paysuites, and the Merchant Entities, to use the Merchant Entities to submit fraudulent credit card transactions through the merchant accounts Plaintiff facilitated, in order to accomplish an unlawful purpose by unlawful means.

188. The use of stolen credit card data to create fraudulent transactions, and the submission of those transactions, constitute tortious and unlawful acts in furtherance of the conspiracy, committed by Wellness, Paysuites, and the Merchant Entities as Limitless X's and Mathur's co-conspirators and agents.

189. Because a civil conspiracy claim renders each conspirator liable for the acts of the others done in furtherance of the conspiracy, Limitless X and Mathur are liable for the acts of Wellness, Paysuites, and the Merchant Entities described throughout this Complaint, notwithstanding that those entities are not named Defendants.

190. As a direct and proximate result of the conspiracy, Plaintiff has been

damaged in an amount to be proven at trial, but no less than $520,675.10.

## COUNT V – VIOLATION OF PENAL CODE § 496
## (Against Limitless X and Mathur)

191. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

192. California Penal Code § 496(a) provides that every person who buys or receives property that has been stolen or obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any such property from the owner, is subject to criminal liability. Penal Code § 496(c) provides that any person injured by a violation of subdivision (a) may bring a civil action for three times the amount of actual damages, costs of suit, and reasonable attorneys' fees.

193. The proceeds of the Merchant Entities' fraudulent transactions described above — including transactions using stolen and unauthorized cardholder data — constitute property obtained by theft or extortion within the meaning of Penal Code § 496(a). Limitless X and Mathur knew, at the time they received, directed the receipt of, concealed, or withheld those proceeds, that the proceeds had been obtained through fraudulent and unauthorized transactions, including the unauthorized use of stolen cardholder data described in Section VI(C) above.

194. Limitless X and Mathur received, and caused to be received, the proceeds of the Merchant Entities' fraudulent transactions through the mechanism described above, whereby each Merchant Entity's agreement with Wellness required that all funds received in that Merchant Entity's merchant account be treated as receivables belonging to Wellness — an entity that acted at all times as an

instrumentality of, and for the benefit of, Limitless X and Mathur — leaving no funds in the Merchant Entities' accounts against which Plaintiff could recover its chargeback losses.

195. Limitless X and Mathur have concealed and withheld those proceeds from Plaintiff, notwithstanding Plaintiff's repeated demands for reimbursement of the chargeback, fee, and penalty liabilities Plaintiff was required to satisfy as a direct result of the fraudulent transactions that generated those proceeds. Plaintiff is informed and believes, and on that basis alleges, that those proceeds currently remain within the control of Limitless X and/or Mathur.

196. As a direct and proximate result of Limitless X's and Mathur's violation of Penal Code § 496(a), Plaintiff has been injured in an amount to be proven at trial, but no less than $520,675.10, and is entitled to recover three times that amount, together with costs of suit and reasonable attorneys' fees, pursuant to Penal Code § 496(c).

**COUNT VI – MONEY HAD AND RECEIVED**

**(Against Limitless X and Mathur)**

197. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

198. A claim for money had and received lies where a defendant is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use and benefit of the plaintiff. (See Farmers Ins. Exchange v. Zerin (1997) 53 Cal.App.4th 445, 460; Schultz v. Harney (1994) 27 Cal.App.4th 1611, 1623.)

199. By the conduct alleged above, Limitless X and Mathur received, and continue to hold, money that in equity and good conscience belongs to Plaintiff — namely, the processing proceeds generated by the Merchant Entities' fraudulent

transactions, for which Plaintiff was contractually obligated to, and did, satisfy the corresponding chargeback, fee, and penalty liability on Limitless X's and Mathur's behalf.

200. Plaintiff has demanded that Limitless X and Mathur account for and return those sums, in a present amount of not less than $520,675.10. Limitless X and Mathur have failed and refused to do so and remain indebted to Plaintiff for that amount, together with interest thereon.

201. Limitless X and Mathur should be ordered to identify, account for, and remit to Plaintiff all sums received for Plaintiff's use and benefit, together with interest thereon at the legal rate, and Plaintiff's reasonable attorneys' fees and costs to the extent recoverable.

## COUNT VII – INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

## (Against Limitless X and Mathur)

202. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

203. Plaintiff maintained an ongoing economic relationship with its sponsoring/acquiring bank, including the Referral Agreement alleged above, from which Plaintiff reasonably expected continuing commissions and other economic benefits from the referral and servicing of legitimate merchants.

204. Limitless X and Mathur knew of Plaintiff's relationship with its sponsoring bank and knew that Plaintiff depended on that relationship to obtain processing access for referred merchants and to earn commissions from legitimate processing activity.

205. Limitless X and Mathur intentionally disrupted that relationship through independently wrongful conduct, including the fraud and wire-fraud scheme alleged herein: concealing the true ownership, control, and intended use of the Merchant Entity accounts; causing unauthorized or fraudulent transactions to be submitted; and shifting resulting chargebacks, fees, and penalties onto Plaintiff. Defendants' conduct made Plaintiff's performance of its obligations to the sponsoring bank substantially more costly and burdensome and impaired the economic value of the relationship.

206. Defendants intended that their conduct disrupt Plaintiff's relationship with its sponsoring bank or knew that disruption was substantially certain to result. As a direct and proximate result, Plaintiff suffered actual disruption and economic harm, including chargeback, fee, penalty, reserve, and related losses in an amount to be proven at trial.

**COUNT VIII – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

**(Against Limitless X and Mathur)**

207. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

208. Plaintiff and its sponsoring/acquiring bank were parties to the Referral Agreement and related contractual arrangements alleged in paragraphs 56–63 above, which governed Plaintiff's solicitation and servicing of merchants and allocated to Plaintiff responsibility for specified merchant losses, including uncollectible chargebacks.

209. Limitless X and Mathur knew of the essential nature of that contractual relationship, including that Plaintiff was acting as an ISO for a sponsoring bank and

would bear financial exposure arising from merchants it referred.

210. Limitless X and Mathur intentionally engaged in the fraudulent merchant-account and transaction scheme alleged herein for the purpose of obtaining processing access and shifting the economic consequences of fraudulent transactions away from themselves. Those acts were designed to and did disrupt Plaintiff's performance and enjoyment of its contracts with the sponsoring bank by imposing substantial chargeback, fee, penalty, and related liabilities and making Plaintiff's performance substantially more costly and burdensome.

211. As a direct and proximate result of that intentional disruption, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT IX – QUASI-CONTRACT / RESTITUTION BASED ON UNJUST ENRICHMENT

## (Against Limitless X and Mathur)

212. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

213. By satisfying chargebacks, fines, fees, and related liabilities generated by the Merchant Entities while Limitless X and Mathur allegedly retained or received the economic benefit of the fraudulent processing proceeds, Plaintiff conferred a measurable benefit that allowed Defendants to retain proceeds without bearing the corresponding processing losses.

214. Upon information and belief, Limitless X and/or Mathur received or retained proceeds and profits traceable to the Merchant Entities' fraudulent transactions while Plaintiff was required to satisfy the corresponding chargeback and related liabilities.

215. It would be unjust for Limitless X and Mathur to retain those benefits while shifting the associated losses to Plaintiff. Plaintiff therefore pleads, in the alternative to its tort and statutory claims, a quasi-contract claim seeking restitution of benefits unjustly retained by Defendants.

216. Plaintiff seeks restitution in an amount to be determined at trial, limited to benefits that are properly recoverable in restitution and without duplicative recovery.

**COUNT X – CONVERSION**

**(Against Limitless X and Mathur)**

217. Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

218. Limitless X and Mathur wrongfully took, received, diverted, or retained specifically identifiable processing proceeds, reserves, or other funds in which Plaintiff had an immediate right to possession or payment under the merchant-processing arrangements alleged herein.

219. The converted funds are specific and capable of identification through the Merchant Entities' processing, settlement, bank, and transfer records, including without limitation: (a) the proceeds swept from the Merchant Entity accounts pursuant to the Wellness reseller-type agreements described in Section VI(C) above, under which all funds received in each Merchant Entity's account were contractually treated as receivables of Wellness rather than of the nominal merchant; (b) the merchant-ID and Kount portal records reflecting Limitless X personnel's direct management of the "our mids" accounts identified in Predicate Act 3 above; and (c) the billing-descriptor and transaction data confirming that the funds generated by the Merchant Entities' accounts were, in substance, proceeds of Limitless X's own

product sales.

220. Limitless X and Mathur engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Civil Code § 3294(c), entitling Plaintiff to an award of punitive damages in an amount sufficient to punish and deter such conduct.

221. As a direct and proximate result of Limitless X's and Mathur's conversion, Plaintiff has suffered damages in an amount to be proven at trial, but no less than $520,675.10.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants Limitless X Holdings, Inc. and Jaspreet "Jas" Mathur on each and every count alleged in this Complaint, and further:

A. Award compensatory and actual damages in an amount to be proven at trial, but in any event no less than $520,675.10;

B. Award treble damages on Plaintiff's RICO claims pursuant to 18 U.S.C. § 1964(c);

C. Award treble damages against Limitless X and Mathur pursuant to Penal Code § 496(c);

D. Award punitive damages against Defendants in an amount sufficient to punish and deter their conduct, to the extent permitted by applicable law;

E. Order restitution of benefits and traceable funds recoverable under Plaintiff's state-law equitable claims, without duplicative recovery;

F. Enter such equitable relief as is authorized by the claims and remedies ultimately established, including, where legally available, preservation, tracing, or accounting relief concerning specifically identifiable assets or

proceeds;

G. Credit against any compensatory award amounts actually collected on the Cook County judgments for the same injury so as to prevent double recovery;

H. Award Plaintiff its reasonable attorneys' fees and costs of suit pursuant to 18 U.S.C. § 1964(c) and any other applicable statute or contractual provision;

I. Award prejudgment and post-judgment interest at the highest rate allowed by law; and

J. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury as to all issues and causes of action so triable.

Dated: September 18, 2026 Respectfully submitted,

LACE MARKETING, LLC d/b/a LEISUREPAY

By: *<u>/s/ Michael McCollum</u>*

Michael McCollum
CA Bar No. 235447
McCollum Counsel
1500 W. Alhambra Rd.
Alhambra, California 91801
(213) 534-6070
michael@mccollumcounsel.com